# COURT OF APPEALS
## DECISION
## DATED AND FILED

## June 1, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal Nos. 2022AP293
2022AP294
2022AP295
STATE OF WISCONSIN**

Cir. Ct. Nos. 2019TP119
2019TP120
2019TP121

**IN COURT OF APPEALS
DISTRICT I**

---

APPEAL NO. 2022AP293

IN RE THE TERMINATION OF PARENTAL RIGHTS TO R.J.R, A PERSON UNDER THE AGE OF 18:

STATE OF WISCONSIN,

      PETITIONER-RESPONDENT,

   V.

S. R.,

      RESPONDENT-APPELLANT.

---

**APPEAL NO. 2022AP294**

**IN RE THE TERMINATION OF PARENTAL RIGHTS TO J.G.R, A PERSON UNDER THE AGE OF 18:**

**STATE OF WISCONSIN,**

      **PETITIONER-RESPONDENT,**

  **V.**

**S. R.,**

      **RESPONDENT-APPELLANT.**

**APPEAL NO. 2022AP295**

**IN RE THE TERMINATION OF PARENTAL RIGHTS TO A.G.R, A PERSON UNDER THE AGE OF 18:**

**STATE OF WISCONSIN,**

      **PETITIONER-RESPONDENT,**

  **V.**

**S. R.,**

      **RESPONDENT-APPELLANT.**

---

APPEALS from orders of the circuit court for Milwaukee County: MARSHALL B. MURRAY, Judge. *Affirmed*.

¶1    WHITE, J.[1]  S.R. appeals the order terminating her parental rights to her children, R.J.R.; J.G.R.; and A.G.R. She argues that the circuit court erroneously exercised its discretion in concluding that it was in the best interests of the children to terminate S.R.'s parental rights because there was no evidence presented to the court of the foster parents' adoptive intent by their own testimony and there was no expert testimony to corroborate the family case manager's opinions about the children's bonds with S.R. We reject S.R.'s arguments and, accordingly, we affirm.

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(e) (2019-20). All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

**BACKGROUND**

¶2     In July 2019, the State filed petitions to terminate S.R.'s parental rights to R.J.R., born in July 2009; J.G.R., born in May 2013; and A.G.R., born in May 2016.[2]  For grounds, the State alleged continuing CHIPS[3] and failure to assume parental responsibility.  The children were removed from S.R.'s care in August 2017 when she posted bail for A.A., her oldest child who was an adult throughout these proceedings and who was arrested for sexually abusing J.G.R., and then she allowed him to live in the upper unit of the family duplex, which allowed him access to her younger children.  The petitions alleged that four of S.R.'s five children had been sexually abused while in her custody and three of them had sexually assaulted other children.[4]

¶3     The case proceeded to a five-day jury trial in April 2021.  At the trial, the State called a licensed psychologist who testified that she performed a psychological evaluation of S.R. in July 2019, after which she concluded that S.R. had "an unspecified neuro-psychological disorder."

¶4     The State then called S.R., who testified about her children, her understanding about what happened to J.G.R., and the sexual abuse conviction of

---

[2] S.R.'s three children were subject to separate TPR actions that were tried together at the circuit court and are consolidated on appeal.  For ease of reading, we refer to the cases in the singular.

[3] "CHIPS is the commonly used acronym to denote the phrase 'child in need of protection or services' as used in the Wisconsin Children's Code, chapter 48, Stats." *Marinette Cnty. v. Tammy C.*, 219 Wis. 2d 206, 209 n.1, 579 N.W.2d 635 (1998).

[4] After the petitions were filed, S.R. gave birth to her sixth child, C.R.R., who is not a subject of this action.  Additionally, S.R.'s second oldest child, B.G.R., is an adult and is not a subject of this action.

A.A. S.R. stated that she was not aware of what A.A. was accused of doing to J.G.R. until during A.A.'s trial and that she had been forbidden to discuss the matter with J.G.R. She testified that she posted bail for A.A. subsequent to his arrest, but she did not understand what he was charged with until the trial. She testified that A.A. never lived in her house again after he was arrested. She explained that A.A. moved in with her brother, and then into his own apartment. Then, shortly thereafter, her brother died and she moved into the duplex where her brother had lived. S.R. testified that she believed J.G.R.'s allegations, but acknowledged that she thought J.G.R. was "just very creative" and that her allegations were not of sexual abuse but instead J.G.R. complaining that A.A. used a bathing sponge on a stick to clean her.

¶5 The State called the family case manager, who testified about the children's removal from S.R.'s care after J.G.R. alleged that A.A. put his penis in her mouth and buttocks. During J.G.R.'s forensics interview, she stated that A.A. inserted a "stick" into her mouth and buttocks, but through the use of dolls and additional questions, J.G.R. stated A.A. used his penis in the assault, not an actual stick of any kind. The family case manager stated that the initial assessment worker put a safety plan in place for the children and determined that S.R. admitted to allowing A.A. to live in the upstairs apartment in her home. She stated that the details of J.G.R.'s allegations against A.A. were shared during the temporary physical custody hearing, which occurred one to two days after the children were removed and that S.R. attended with provided Spanish language interpreters. She testified that S.R. maintained that J.G.R. was lying and that J.G.R. needed to face her brother in court and testify. The family case manager testified that one of the conditions for the children to be returned to S.R. was that

5

she acknowledge that the sexual abuse had taken place. She also stated that S.R. was repeatedly reminded not to call J.G.R. a liar during supervised visitation.

¶6    Then, S.R. called a parenting educator at the Sixteenth Street Community Health Center, who testified that S.R. completed eight parent education classes and received a certificate. The family case manager was then recalled to the stand, who reviewed S.R.'s progress on the conditions of return of the children. She discussed S.R. and the children's separate participation in therapy because the children's therapists did not recommend family therapy. She acknowledged S.R.'s completion of parenting classes. S.R. remained under an order for supervised visitation and had four hours of visitation a week throughout the duration of the case.

¶7    S.R. then called the director of the La Causa crisis nursery, which provides care for children during traumatic situations, homelessness, domestic violence, as well as smaller situations like doctor's appointments, court hearings, and medical emergencies. S.R. utilized the crisis nursery on multiple occasions. In rebuttal, the State recalled the family case manager, who testified that in 2008 S.R. had been "forbidden to use their crisis nursery because [S.R.] had … taken the children to the nursery and had been seen out at a nightclub and additionally there were concerns that were listed that stated she was no longer allowed to use the service."

¶8    The jury found that grounds existed to terminate S.R.'s parental rights to each of the children. After accepting the jury's verdict, the circuit court found S.R. to be an unfit parent.

¶9    The case then moved to the dispositional phase, with hearings conducted over two days in August 2021.  The family case manager testified about the children's ages, health, and time out of S.R.'s care.  S.R.'s daughters, J.G.R. and A.G.R., were placed in the same foster care placement and had been in that family's care for over two years.  The girls' foster parents were approved as an adoptive resource for the girls and expressed to the family case manager that they wanted to adopt them.  The family case manager observed the girls with their foster parents and considered them well bonded.

¶10    The family case manager testified that R.J.R. was placed on a separate foster placement and had been in his foster mother's care for four years.  R.J.R.'s foster mother was a potential adoptive resource for him, although there were concerns due to some concerning sexualized behaviors.  R.J.R. required a "very high level of supervision" because the foster mother had other grandchildren and family members visiting her.  R.J.R. has been in therapy focused on children with sexualized behaviors including individual and group therapy.  The family case manager testified that R.J.R. expressed to her that he wished to stay with his foster mother if he had that choice.  The foster mother expressed to the family case manager that if she were no longer an adoptive resource, she would be willing to continue to provide foster care for R.J.R. until another resource was found.

¶11    The family case manager testified about some of R.J.R.'s recent concerning behavior that led to his foster mother being uncertain about serving as an adoptive resource.  She stated that R.J.R. "sent a concerning text message to a peer … in regard to him wanting to date a two year old toddler" in response to the peer's question about his "type."  Additionally, the family case manager testified that upon learning about this text message, S.R. stated that she did not want R.J.R.

to continue to come on supervised visitation with her and that he "would never be allowed into her house." This upset R.J.R. The family case manager testified that while R.J.R. has a bond with his mother, she would not "call it substantial" and she did not feel he would be harmed if the legal relationship were severed.

¶12    The family case manager described that both J.G.R. and A.G.R. had some behaviors related to visits with S.R., with visit days being difficult. A.G.R. consistently brought up wanting to stay with her foster parents and being concerned she would have to leave. There had been "a couple of occasions where after visits [J.G.R.] would come home distraught and be up screaming." After the trial in April, S.R. had been aggressive in her visits with the children. At a recent visit, "[S.R.] asked [A.G.R.] again if she wanted to come live with her and [A.G.R.] responded no and [S.R.] became upset and emotional … she ended the visit early … grabbing [A.G.R.'s] arm and ripping a braid out of her hair." A.G.R. and J.G.R. have asked the family case manager if visits can be discontinued. She also stated that similar to R.J.R., while the girls had a bond with S.R., it was not substantial and they would not be harmed if the relationships were severed. During cross-examination, the family case manager testified that the foster parents were "willing and open to maintaining contact" if the girls desired to do so.

¶13    S.R. testified on her own behalf during the disposition phase.[5] She testified that the children were all very happy to see her during visits. She

_____

[5] S.R. attempted to argue that it was in the best interests of the children to remain with her for immersion in their Hispanic heritage and culture. The circuit court concluded that without expert testimony or evidence that the stability, community, safety, and schools would be better for the children, the argument was irrelevant to the statutory factors the court considers in TPR actions. The court stated that it did not believe the legislature wanted the court to consider where the child lives or to limit where a child can live based on "race, creed, or religion."

explained that due to the Covid-19 pandemic, her visits with the children have been virtual lately. S.R. stated that she tried to fix A.G.R.'s hair during their last visit, but A.G.R. did not want her to do so and A.G.R. "expressed herself by yelling and she was afraid"; S.R. stated she was not trying to be aggressive. She stated that the three children were very close to each other and they are also very attached to her youngest infant child.

¶14 The court then reviewed the situation and the required statutory factors on the record.[6] The court stated that "these children have been in out of home care for a significant amount of time of their lives[.]" The court concluded that the case was "floundering." It questioned how S.R. could help A.G.R. and

---

[6] In determining the best interests of the children in a TPR action, the circuit court must consider at least the statutorily prescribed factors, although the court is not limited to only the following:

> (a) The likelihood of the child's adoption after termination.
>
> (b) The age and health of the child, both at the time of the disposition and, if applicable, at the time the child was removed from the home.
>
> (c) Whether the child has substantial relationships with the parent or other family members, and whether it would be harmful to the child to sever these relationships.
>
> (d) The wishes of the child.
>
> (e) The duration of the separation of the parent from the child.
>
> (f) Whether the child will be able to enter into a more stable and permanent family relationship as a result of the termination, taking into account the conditions of the child's current placement, the likelihood of future placements and the results of prior placements.

WIS. STAT. § 48.426(3).

J.G.R. through future trauma when she pushed away R.J.R., who was currently struggling.

¶15    The court addressed the application of the six factors in WIS. STAT. § 48.426(3) for each child.  A.G.R. had a "strong likelihood of adoption" if S.R.'s rights were terminated.  There was no barrier in her age or health.  She was removed from S.R.'s care at age two in 2017 and had spent the last two years with her foster parents, who were an adoptive resource.  While A.G.R. knew S.R., she looked at her foster parents as "her parents."  The court concluded that while she had a substantial relationship with J.G.R. and R.J.R., A.G.R. did not have a substantial relationship otherwise with S.R. or with her extended maternal or paternal family and severing the legal relationship with S.R. would not harm A.G.R.  As for wishes, the court noted that A.G.R. is a little young, but recognizing where the child was cognitively, developmentally, and emotionally, A.G.R. expressed never wanting to leave her foster parents and wanting to stay with them at their home.  The court noted that the duration of separation was four years.  The court concluded that A.G.R. would be more likely to be able to enter into a more stable and permanent family relationship as result of the TPR.

¶16    For J.G.R., the court stated that the "likelihood of adoption if the TPR is granted is very high[.]"  There were no barriers to adoption from J.G.R.'s age or health.  She was removed from S.R.'s care at age four and she is now eight years old.  She has been with these foster parents for the past two years.  The court concluded there was "no bond and no evidence of a substantial parental relationship with S.R."  Similar to its considerations about A.G.R., the court concluded there was a relationship with R.J.R. and A.G.R., but severing the relationship with S.R. would not harm J.G.R.  As for the wishes of the children,

J.G.R. expressed that she never wants to leave these foster parents. She has spent a significant period of time out of S.R.'s care. The court concluded that J.G.R. would be able to enter into a more stable and permanent family relationship as a result of the TPR.

¶17 Discussing R.J.R., the court stated that the likelihood of adoption was less clear with R.J.R's current foster placement. However, the court stated he is still an "adoptable child" and his foster parent was willing to be either an adoptive resource or as a placement until he can be adopted. The court stated that having R.J.R. be safe and being helped with appropriate services by the State "may be a better thing [than] being taken care of by a parent who is not able to do so in a safe way." The court stated that he had some behavior issues that may be a barrier to adoption, but he was getting help and getting healthier. The court stated he has been out of S.R.'s care for four years and he was eight years old at removal. For the same reasons that the court addressed for A.G.R. and J.G.R., it concluded that R.J.R. did not have a substantial relationship with S.R. and it would not be harmful to sever the legal relationship. The court stated that R.J.R. needed "time away to heal himself with the help of others" and to "focus on himself." As for R.J.R.'s wishes, he expressed that he wanted to stay with his foster placement if that is an option. He has been out of S.R.'s care for four years, which is "enough." The court concluded that he would be more able to enter into a more stable and permanent family relationship as a result of the TPR. The circuit court concluded that reunification with S.R. was not likely for any of the children, and that even if R.J.R. remained a ward of the State, he was "safer and may be better."

11

¶18    The court stated it was satisfied by clear and convincing evidence that the State has proven it would be in each child's best interests to terminate S.R.'s parental rights. The court signed the TPR orders for each child.

¶19    These consolidated appeals follow.

## DISCUSSION

¶20    The decision to terminate parental rights is within the discretion of the circuit court. *See Gerald O. v. Susan R.,* 203 Wis. 2d 148, 152, 551 N.W.2d 855 (Ct. App. 1996). We will sustain a circuit court's discretionary decision unless the court erroneously exercised its discretion. WIS. STAT. § 805.17(2). A circuit court properly exercises its discretion when it examines the relevant facts, applies a proper standard of law, and using a demonstrated rational process reaches a conclusion that a reasonable judge could reach. *Dane Cnty. DHS v. Mable K.*, 2013 WI 28, ¶39, 346 Wis. 2d 396, 828 N.W.2d 198. This court "will search the record for reasons to sustain the [circuit] court's exercise of discretion." *Lofthus v. Lofthus*, 2004 WI App 65, ¶21, 270 Wis. 2d 515, 678 N.W.2d 393.

¶21    S.R. concedes that the circuit court considered the six required statutory factors under WIS. STAT. § 48.426(3). "While it is within the province of the circuit court to determine where the best interests of the child lie, the record should reflect adequate consideration of and weight to each factor." *State v Margaret H.*, 2000 WI 42, ¶35, 234 Wis. 2d 606, 610 N.W.2d 475. Here, the record supports that the circuit court adequately considered each factor for each child.

¶22    However, S.R. argues that the court's conclusion that termination was in the children's best interests was unreasonable because there was no

evidence introduced by and through a proposed adoptive resource for each child. She contends that for the court to properly consider the "likelihood of adoption" it would need to receive additional testimony from the foster parents themselves and that the testimony of the family case manager was insufficient. Second, she argues that the decision was unreasonable because there was no evidence to support that the children would actually enter into a more stable family relationship if the terminations were granted. Third, she argues that there was no expert testimony presented to corroborate the family case manager's testimony that the children would be able to enter into a more stable and permanent family relationship as a result of termination. She points out that there was no bonding assessment or family study presented to the court. Finally, she asserts that her ability to parent her youngest child without continued state intervention was proof that she could provide familial stability and care to the other three children.

¶23    We reject S.R.'s arguments that ask us to conclude that the circuit court's considerations of the factors were inadequate or ill-founded. The State responds that S.R. asks this court to elevate the consideration of statutory factors one and six. We agree that it is not this court's role to assign the weight of the factors. *See Margaret H.*, 234 Wis. 2d 606, ¶35. Instead, this court searches the record to "sustain the [circuit] court's exercise of discretion." *Lofthus*, 270 Wis. 2d 515, ¶21. The record reflects dramatically different accounts of S.R.'s actions and beliefs during the past four years. The court's conclusions were drawn from its factual findings. The court's acknowledgment that R.J.R.'s situation had on-going struggles did not diminish the adequacy of its findings. There is ample evidence to support the court's ultimate conclusion that the TPR was in the best interests of the children.

¶24 As for S.R.'s arguments based on the court needing to consider additional evidence in the form of testimony by the foster parents or an expert witness, we reject that such testimony is required under Wisconsin law.[7] A foster parent has a "right to be heard at a dispositional hearing" on a TPR action. WIS. STAT. § 48.427(1m). "Any party may present evidence relevant to the issue of disposition, including expert testimony, and may make alternative dispositional recommendations to the court." Sec. 48.427(1). Nevertheless, such testimony is not required for the circuit court to reach a reasonable conclusion. S.R. fails to develop these arguments with citation to relevant legal authorities. We decline to review issues inadequately briefed. *See **State v. Pettit***, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992).

---

[7] S.R. concedes that it is not a categorical rule that the circuit court must hear from the adoptive resource; however, she asserts that in this case the circuit court was unable to properly exercise its discretion without such information. We disagree. Although the record is not developed on this point, we note that during rebuttal in the closing argument for the dispositional hearing, the State commented:

> There is a discussion about the foster parent's testimony, I would hope that the [c]ourt will understand that I'm very cognizant of the time we have and using or being efficient and I think that [the family case manager] was able to provide the [c]ourt with an idea about the commitment of the foster parents.… I would also note that although it is related to the grounds phase paragraph 7 of [S.R.'s counsel's] motion in limine asks to prohibit any foster parent testimony in the grounds phase saying any relevant and probative testimony that the foster parents may offer in this matter could be provided through a stipulation between the parties or another witness, which is exactly what we have done.

Although a motion in limine in the grounds phase would not bar testimony in the dispositional phase, this comment provided context to the record. Recognizing that S.R.'s trial counsel may have employed this motion in limine strategically, we will not conclude that the State's failure to present any foster parent testimony in this case was dispositive.

¶25    As for SR's argument that because R.J.R.'s adoptive resource was uncertain at the time of disposition, the circuit court could not reasonably conclude that R.J.R. would be more able to enter into a more stable and permanent family relationship if the TPR were granted, the sixth statutory factor. "The decision whether to terminate a parent's rights to a child can be one of the most wrenching and agonizing in the law." *Sheboygan Cnty. DHS v. Julie A.B.*, 2002 WI 95, ¶29, 255 Wis. 2d 170, 648 N.W.2d 402. Here, the record reflects that the circuit court analyzed R.J.R.'s situation in sober reality. It analyzed that a child "being helped and safe" and getting his needs met by the State would be in a better position than a child "being taken care of by a parent who is not able to do so in a safe way." The court heard evidence that S.R. had not satisfied the conditions of return to be reunited with R.J.R. and was unlikely to do so. Further, the court heard evidence that after RJR's concerning text message was discovered, S.R. did not want to see R.J.R. and he "would never be allowed into her house." The record reflects that circuit court considered R.J.R.'s best interests, acknowledging that he may not be adopted immediately but that his needs would not be met by continuing to preserve SR's parental rights. We discern no error in the court's consideration of the sixth factor of WIS. STAT. § 48.426(3) as it related to R.J.R.

¶26    Here, the circuit court found S.R. unfit after the jury found that grounds existed for the TPR action. The court then conducted a dispositional hearing to determine whether TPR is in the best interests of the child. "The court should explain the basis for its disposition, on the record, by alluding specifically to the factors in WIS. STAT. § 48.426(3) and any other factors that it relies upon in reaching its decision. *Julie A.B.*, 255 Wis. 2d 170, ¶30. The circuit court fulfilled this requirement. It examined the relevant facts under the proper standards of law. It explained its reasoning on the record and reached a decision a reasonable court

15

could reach. Therefore, we conclude that the court's decision was not an erroneous exercise of discretion.

**CONCLUSION**

¶27 For the reasons stated above, we affirm the circuit court's order terminating S.R.'s parental rights to R.J.R., J.G.R., and A.G.R.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(b)4.